## A03A1069. PARISIAN, INC. v. COBB COUNTY BOARD OF TAX ASSESSORS.

(587 SE2d 771)

ELLINGTON, Judge.

Parisian, Inc. sued the Cobb County Board of Tax Assessors (BTA) primarily to seek injunctive relief from a scheduled four-year tax audit. Parisian appeals the grant of summary judgment to the BTA.[1] Because we find material issues of disputed fact that preclude summary adjudication, we reverse.

On summary judgment, this Court conducts a de novo review of the entire record to determine whether the trial court erred in its ruling. *Rubin v. Cello Corp.*, 235 Ga. App. 250 (510 SE2d 541) (1998). Summary judgment is appropriate when the facts and evidence and reasonable inferences therefrom are considered in a light most favorable to the nonmovant and do not demonstrate the existence of a triable issue. Id. at 251. So considered, the evidence shows that the BTA reassessed Parisian's 2000 personal property tax return for its inventory in its Town Center Mall store in Cobb County after Glenn Heckman, an appraiser in the tax assessors' office, noticed a reduction in the value assigned by Parisian to its inventory for that tax year. Heckman decided to "roll[ ] over the prior year's, 1999's, inventory value." After adjusting the value of Parisian's personal property inventory back to the 1999 value, the BTA notified Parisian of its reassessment.

In response, on July 7, 2000, Parisian timely filed an ad valorem tax appeal for tax year 2000 to challenge that reassessment. Over the next several months, Parisian and the BTA attempted to resolve the valuation issue. The quantity and wholesale cost of Parisian's personal property inventory were never in dispute. At issue was whether that inventory should be valued at its wholesale cost without reduction or should be valued at its wholesale cost less a percentage of markdowns, cash allowances, and vendor discounts that Parisian claimed reflect the inventory's true market value. To support its calculation of the inventory's actual value, Parisian submitted documentation to the BTA. An independent tax consultant and certified public accountant, Randy Ochs, provided a detailed analysis to explain the basis for valuing the inventory at less than wholesale cost. On October 19, 2000, Ochs explained to Heckman why Parisian's stock ledger system overstated the true value of the inventory. Ochs attached supporting documentation to his letter. Notwithstanding Parisian's explanations about discounts, markdowns, and allowances, Melvin R. Plunkett, the division manager of personal prop-

---

[1] Finding this case did not fall within its equity jurisdiction, the Supreme Court transferred it to this Court.

erty in the tax assessors' office, rejected Parisian's analysis. Plunkett testified, "[i]t remained open as an open appeal, because we did not accept their reductions in inventory value." After negotiations on valuing the inventory foundered, Donald M. Barnhill, Parisian's national property tax director, contacted Plunkett directly in a final effort to settle the issue. Unable to resolve the impasse, Barnhill decided to appeal to the Board of Equalization (BOE). While Parisian's appeal to the BOE was pending, the BTA notified Parisian that it would have to undergo a four-year audit for tax years 2000, 1999, 1998, and 1997.

In addition to designating Parisian for the four-year audit, the BTA attempted to prevent the BOE from hearing Parisian's tax appeal. When the BOE scheduled a hearing date for February 28, 2001, Plunkett asked the BOE on February 13 to remove Parisian's appeal from the BOE's calendar, instructing them not to reschedule "until further notice from the Personal Property Division." The next day, Plunkett notified Parisian that "Cobb County has elected to suspend the BOE hearing until after the audit has been completed." Disregarding that letter, Parisian again requested a hearing date, and the BOE scheduled Parisian's appeal for May 22, 2001. On that date, Parisian's representatives were prepared to present the case when Plunkett, appearing on behalf of the BTA, asked the BOE to delay hearing the appeal until after the audit was completed. Thus, at the behest of the BTA, the BOE did not conduct a timely hearing on Parisian's appeal within the statutory period mandated by OCGA § 48-5-311 (e) (6) (B).

To prevent the BTA from launching a four-year audit for what Parisian alleged constituted "vindictive prosecution," Parisian filed suit against the Cobb County BTA seeking injunctive relief and to obtain a writ of mandamus compelling the BOE to adjudicate its appeal.[2] Parisian sought not only to enjoin the BTA from conducting the four-year tax audit but also to prevent the BTA from using the accounting firm of Mendola & Associates, LLC (Mendola) for performing the audit. Parisian alleged, inter alia, that the BTA's decision to conduct the audit was a misuse and abuse of the auditing process in order to discourage Parisian from exercising its statutory right to appeal its 2000 tax assessment, and was calculated to punish and deter Parisian and other businesses from filing appeals. Parisian, a wholly owned subsidiary of Saks, Inc., also alleged that Mendola "cannot be impartial and unbiased" because of Mendola's

---

[2] Parisian dismissed its request for mandamus relief because the BOE heard its appeal for tax year 2000 after Parisian filed this lawsuit.

prior history with Saks that had resulted in Mendola losing its auditing contract with Fulton County.

The BTA moved for summary judgment. The BTA asserted that its "sole reason for initiating the audit of Parisian, Inc. was to satisfy its statutory obligation to insure that all taxes due the state or the county were paid in full." The BTA argued that it had selected Parisian's account for audit after discovering that Parisian "claimed an abnormally large reduction in the value of its personal property returned and Cobb County was unable to verify the basis for the reduction." The BTA stated that "Mendola & Associates played absolutely no role whatsoever in deciding to initiate the audit against [Parisian]." The BTA asserted that the decision to audit was made "in good faith" and was "standard and routine" under the circumstances.

After finding no genuine issues of material fact, the trial court granted summary judgment to the BTA. Parisian appeals.

1. Parisian asserts that the trial court erred in granting summary judgment because the record contains undisputed evidence that the BTA did not have any audit selection criteria in place at the time that Parisian was designated for audit and there was evidence that the BTA decided to audit Parisian based upon an improper purpose, in violation of OCGA § 48-5-299 (a). We agree.

In *Fulton County Bd. of Tax Assessors v. Saks Fifth Ave.*, 248 Ga. App. 836 (547 SE2d 620) (2001), this Court voiced concern about the delegation of unfettered discretion to an accounting firm under similar circumstances. We observed:

> [t]his [C]ourt is troubled by the manner in which the Board and Mendola are conducting taxpayer audits. The record reflects that Mendola has contracts with 26 Georgia taxing authorities, plus other governmental entities, and conducts approximately 3,000 audits per year for taxing authorities performed by 25 employees. It is clear from the record in this case that the Board maintains no supervision over Mendola in the performance of its audits or in the handling of taxpayer's documents. Mendola maintains Board stationery and subpoenas of the Board and of 31 other Georgia counties.

Id. at 842-843. In urging legislative action or review by the appropriate government entities, we noted that "[t]he cavalier fashion in which taxpayer audits are being handled and the potential for abuse therein are causes for concern." Id. at 844.

Here, the evidence shows a similar pattern of unbridled delegated authority. At the time that Parisian was designated for the four-year audit, the BTA lacked any established written procedures

for selecting a taxpayer for audit. The present and former chairs of the BTA testified that when Parisian was designated for audit the BTA had not yet approved any audit selection criteria and lacked written policies governing audits.[3] Plunkett conceded that before the adoption of the written procedures for selecting taxpayers for audit, his office had only "piecemeal" procedures. Plunkett also admitted that when a taxpayer is designated for a four-year audit, the BTA itself does not have to approve that selection.

Other evidence shows that, using the BTA's letterhead, Mendola drafted the audit notification letter dated December 5, 2000, that informed Parisian about the impending four-year audit. Plunkett testified that Mendola drafted the letter, but Plunkett reviewed and signed it. The notification was then mailed from Plunkett's office. This letter informed Parisian that it would be audited "for the years 2000, 1999, 1998 and 1997" in order "to gather information to make an accurate determination of the property owned in the county for the purposes of ascertaining what real and personal property is subject to taxation."[4]

The record contains evidence to support a finding that the BTA may have designated the four-year audit for an improper purpose. In responding to Parisian's interrogatories, the BTA admitted that Parisian's appeal of the ad valorem tax assessment "was pending for tax year 2000 at the time the decision was made to audit Plaintiff." According to Plunkett, fewer than 100 taxpayers were referred for a personal property tax audit in 2000. Of the 30 businesses designated for audit in mid-November 2000, the same time as Parisian, 15 were randomly selected. Of the 15 nonrandom selectees, at least half of them had ad valorem tax appeals pending at the time the BTA placed them under audit. When Plunkett was asked, "[w]as there anything in the file to indicate if there was anything wrong with Parisian's 1997 tax returns?" he responded, "[n]ot to my knowledge." Plunkett also conceded that the same was true for Parisian's 1998 tax returns. When asked about the 1999 tax return, Plunkett testified, "[w]e initially accepted it as filed, yes, we did. . . . It was not flagged for an audit in '99." When later asked, "[w]hy was Parisian selected not just for an audit for the year 2000 but for a four-year audit?" Plunkett said, "[w]ell, there was a question about their '99 inventory value as well." But when questioned, "[s]o why are they being audited for [four] years instead of just two years?" Plunkett responded, "[j]ust [because] we have the authority to go back four years."

---

[3] It is undisputed that the BTA did not adopt its written audit selection criteria until October 2001, after this case was already pending.

[4] Plunkett was unable to explain why the audit specified "real and personal property," and guessed that the notice should not have said "real" property.

Further, when Richard Thornton, the board chairman in 2000, was asked, "Do you know if [Plunkett] consulted with Mr. Mendola about whether to audit Parisian?" Thornton responded, "I doubt it, because under our rules, [Plunkett] has to make that decision." When Thornton was asked, "[d]o you know if Mr. Mendola is involved at all in the selection of taxpayers who are to be audited?" Thornton responded, "[no], sir, he is not." Yet, the record contains evidence which suggests that Mendola made the decision to conduct the four-year audit, then obtained Plunkett's approval for doing so. It appears that Mendola, not Plunkett, drafted the letter informing Parisian of the four-year audit. There was also evidence that Mendola would benefit financially by auditing Parisian and gain still more by conducting the four-year audit of Parisian rather than a one-year audit. Also, Barnhill testified without contradiction that Fulton County had discontinued its contract with Mendola after Saks sued the county, thus affording a possible motive for Mendola to act in a less than impartial manner toward Parisian.

In light of the absence of written, objective criteria for selecting businesses for audits at the time that Parisian was designated, the evidence that the BTA attempted to thwart Parisian's effort to exercise its statutory right to prompt adjudication of its appeal before the BOE under OCGA § 48-5-311, as well as the existence of a jury issue as to whether Mendola or the BTA may have decided to conduct the four-year audit of Parisian due to an improper purpose, we find that summary judgment was improper. See *Willis v. Dept. of Revenue*, 255 Ga. 649, 650-651 (3) (a) (340 SE2d 591) (1986).

2. We also address the BTA's argument that Parisian's "claim for injunctive relief fails because there was an adequate remedy at law." Citing *Wilkes v. Redding*, 242 Ga. 78, 79 (247 SE2d 872) (1978), and *Glynn County Bd. of Tax Assessors v. Haller*, 273 Ga. 649, 650 (3) (543 SE2d 699) (2001), the BTA contends that Parisian should have "filed an appeal pursuant to OCGA § 48-5-311 contesting the denial of its reduction in the value of its merchandise for 2000." However, "OCGA § 48-5-311 provides a statutory appeals process for taxpayers to challenge a property tax assessment based on the issues of taxability, uniformity, and value." (Footnote omitted.) *Glynn County Bd. of Tax Assessors v. Haller*, 273 Ga. at 650 (3). The BTA's argument overlooks the fact that Parisian is no longer challenging its property tax assessment, but is seeking to avoid a multi-year audit that Parisian attributes to an improper motive. See *Willis v. Dept. of Revenue*, 255 Ga. at 650-651 (3) (a). Upon remand, the trial court must reach the merits of Parisian's claim for injunctive relief and determine whether the BTA commenced the four-year audit for retaliatory or coercive purposes or for a legitimate reason within the ambit of OCGA § 48-5-299.

3. In light of our holding in Divisions 1 and 2, we need not address the remaining issues.

*Judgment reversed. Phipps, J., concurs. Blackburn, P. J., concurs fully and specially.*

BLACKBURN, Presiding Judge, concurring fully and specially.

I fully concur with the majority opinion. I write to express my concern as to the practice of various taxing authorities in their dealings with Georgia taxpayers. My concerns were originally raised in *Fulton County Bd. of Tax Assessors v. Saks Fifth Ave.*[5] The practice of turning over blank government stationery and subpoenas to a nongovernment contractor, who selects those to be audited, subject only to the approval of the taxing authority is unsavory, if not an improper delegation of authority. This is especially true given the fact that the contractor has a financial interest which is affected by its choices. The record here reflects that the selection of a four-year rather than a two-year audit was based solely on the fact that the Cobb County Board of Tax Assessors (BTA) has the authority to go back four years. The fact that at least half of the 15 nonrandom selectees for audit had ad valorem tax appeals pending at the time of their selection for audit by BTA raises a strong inference of a relationship between these facts. We note that *Mendola*, BTA's contractor, had lost its contract with Fulton County, following *Fulton County Bd. of Tax Assessors v. Saks Fifth Ave.* in which a sister company of Parisian had prevailed. The denial of facts by the BTA which are in conflict with the record and the past history of audits by *Mendola* raise questions as to the treatment of Cobb County taxpayers by the BTA. As Henry David Thoreau once said, "Some circumstantial evidence is very strong, as when you find a trout in the milk."

In light of this case and *Fulton County Bd. of Tax Assessors v. Saks Fifth Ave.*, I would strongly encourage the Attorney General of Georgia to inquire into the legality of auditing practices of county taxing authorities in Georgia for the protection of Georgia taxpayers. The citizens of Cobb County would also be well served by a meaningful review of the practices of the Cobb County Board of Tax Assessors by the Cobb County Commission. Georgia citizens should expect fair treatment by government agencies and oversight of their practices by governing authority, without having to resort to the courts for protection.

---

[5] *Fulton County Bd. of Tax Assessors v. Saks Fifth Ave.*, 248 Ga. App. 836 (547 SE2d 620) (2001).

DECIDED SEPTEMBER 5, 2003 —
RECONSIDERATION DENIED SEPTEMBER 24, 2003 —

*Webb, Tanner & Powell, Steven A. Pickens, Matthew P. Benson*, for appellant.

*Haynie, Litchfield & Crane, Douglas R. Haynie, H. Scott Gregory, Jr.*, for appellee.